*19 OPINION.
Black:
The principal difference between the instant proceeding and the case of L. B. Coley, 45 B. T. A. 405, is that during the taxable year 1935 Coley was a direct stockholder of Coca-Cola, whereas petitioner Dodd was a stockholder of International, which in turn was a stockholder of Coca-Cola. Both Coley and Dodd were parties to the same plan under which Coca-Cola during 1935 desired to obtain and did obtain for retirement a balance of 71,755 shares of its class A stock at the redemption price of $52.50 per share plus $1.30 per share for accrued dividends. Coley, being a direct stockholder of Coca-Cola, participated in the plan by delivering 1,000 shares of class A stock of Coca-Cola to Equitable, as agent, which in turn delivered the shares to the Trust Co. of Georgia as escrow agent, which in turn delivered the shares (as a part of the 71,755 shares) to Coca-Cola for retirement and for cash, which cash the escrow agent then paid over to Coley. In our report in the Coley case, we held that the cash thus received by Coley was an amount distributed in partial liquidation of a corporation as the term “amounts distributed in partial liquidation” is used in section 115 (c) and defined in section 115 (i) of the *20 Revenue Act of 1934, and that there should be taken into account in computing Coley’s net income 100 percent of Coley’s gain in the transaction. Dodd, being a stockholder of International, participated in the plan by delivering 600 shares of class A stock of International direct to the Trust Co. of Georgia as escrow agent, who in turn delivered the shares to International for retirement and in exchange for 1,200 shares of class A stock of Coca-Cola, which 1,200 shares (as a part of the 11,755 shares) the escrow agent then delivered to Coca-Cola for cash, which cash the escrow agent then paid over to Dodd. The question involved in the present case is whether the gain Dodd realized from participating in the plan should be taxed any differently than the gain Coley realized from participating in the plan. The parties are in agreement as to the amount of the gain, since they have now agreed upon the cost basis, but differ only as to the percentage thereof to be taken into account in computing net income. Petitioner contends that the amount he received from the escrow agent was merely the consideration for á “sale” by him of his 600 shares of International class A stock and that he is entitled to the benefits of section 117 (a) of the Revenue Act of 1934, whereas the respondent contends that the amount so received represents “amounts distributed in partial liquidation” as that term is used in section 115 (c) and defined in section 115 (i) of the Revenue Act of 1934, so that as provided in section 115 (c) “Despite the provisions of section 117 (a), 100 per centum of the gain so recognized shall be taken into account in computing net income.” These sections of the statute are printed in the margin of the Coley case and need not be repeated here.
Petitioner in support of his contention argues that he actually sold the 600 shares of International stock and not the 1,200 shares of Coca-Cola stock; that neither Equitable nor any other person or corporation was empowered by petitioner to exchange petitioner’s International stock for Coca-Cola stock; that the petitioner can not be held accountable for the exchange which was made; and that, if petitioner is legally responsible for the exchange, then the exchange was an intermediate and transitory transaction, and the taxable transaction would be the net result, namely, a sale by petitioner of his 600 shares of International class A stock for cash from Coca-Cola.
Petitioner has requested the Board to find the facts as stipulated and also to make four additional findings as follows:
1. The Taxpayer disposed of his 600 shares of Coea-Oola International Class A upon a sale thereof as the term “sale” is used in Section 112 (a) of the Revenue Act of 1934.
2. The act of the Trust Company of Georgia, The Equitable Company, or The Coca-Cola Company in having Taxpayer’s 600 shares of Coca-Cola International A exchanged for 1200 shares of Coca-Cola Company Class A was not authorized by the Taxpayer, nor is it to be attributed to the Taxpayer.
*21 3. If such exchange is, for tax purposes, attributable to Petitioner, it was merely a transitory transaction carried through to effectuate the ultimate objective of selling Petitioner’s stock for cash, and the exchange is not in and of itself a separate, independent taxable transaction, but is one step only in an entire transaction wherein taxpayer sold his Coca-Cola International A for cash.
4. The Petitioner is entitled to the benefit of the Capital Gains Section.
We found the facts as stipulated, but we are unable to make the special findings requested by petitioner, for reasons which we shall presently state.
The primary question for determination in our opinion is, For whom did the Trust Co. of Georgia act when it delivered the 12,616 shares (including the 600 shares here in question) of International class A to International’s transfer agent for retirement and in exchange for 25,232 shares of Coca-Cola class A stock? Petitioner contends that the Trust Co. of Georgia was acting for the account of Coca-Cola, whereas the respondent contends that it was acting for petitioner’s account. From an examination of the facts set out in our findings, we hold that the respondent’s contention must prevail.
In order to reach a decision on the issue involved in this case a careful analysis of the facts must be made. We have endeavored to make such an analysis. A very important document to consider, of course, is the contract which was signed on October 8, 1935, between petitioner Dodd, as owner, and the Equitable Co., as agent. Clause 3 of that contract reads in part as follows:
3. The Owner authorizes the Agent to sell to The Coca-Cola Company, for the Owner’s account, on or before December 12, 1985, 1200 shares of Coca-Cola Class “A” Stock at Fifty-two and 50/100 ($52.50) Dollars a share, plus accrued dividends. * * *
If that had been the only clause of the contract which described and controlled the kind of stock which was to be sold and delivered, it seems to us that the inevitable result of the whole series of transactions in the instant case would come out the same as in the Coley case. The petitioner concedes in his brief that this would be true. But petitioner points to clause 6 of the contract, which reads as follows:
6. For the purposes of this agreement, one (1) share of Coca-Cola International Corporation Class “A” stock and the exchange fee will be considered as the equivalent to two (2) shares of Coca-Cola Company Class “A” stock.
After quoting this clause of the contract and pointing out that it was under it that petitioner deposited his 600 shares International class A stock with the Trust Co. of Georgia for subsequent sale and delivery to Coca-Cola, petitioner says in his brief:
* * * This can mean nothing less than that Mr. Dodd signed a contract under which he had the option of delivering either 600 shares of International A or 1200 shares of Coca-Cola A, and he elected to take the former. As Mr. Dodd complied with the terms of the contract in delivering 600 shares of Inter *22 national A, then there can be no implied authority in any one to exchange the GOO shares of International A for 1200 shares of Coca-Cola A, and the Taxpayer had done everything that he agreed to do in his contract. * * *
From this premise petitioner argues that if the transaction, in so far as petitioner was a party to it as actually carried out, was a purchase by Coca-Cola of International A, from petitioner, the investigation comes to an end in favor of the taxpayer. We agree to the soundness of this latter proposition if the facts are as therein stated. But we think petitioner errs in his construction of the facts. There can be no doubt, we think, that a group of stockholders óf Coca-Cola and o'f International started out with the purpose in view of avoiding a call for redemption by Coca-Cola of a part of its class A stock. They were, of course, well within their legal rights to do this. In order to accomplish this purpose they drew up a contract with Equitable as their agent. This contract contemplated that either Coca-Cola class A stock or International class A stock would be deposited under the contract, and that Equitable would sell and deliver to Coca-Cola both classes of the stock. There can be no doubt, we think, that, when petitioner Dodd signed the contract with Equitable and later deposited his 600 shares International A stock with the Trust Co. of Georgia, he fully expected that these identical shares would be sold and delivered to Coca-Cola. He so testified at the hearing and we have no reason to doubt his testimony.
However, at that particular time Coca-Cola had not agreed to purchase any shares of stock either of Coca-Cola class A stock or of International class A stock. What Coca-Cola had under consideration was a call for redemption of a certain number of shares of its class A stock
After certain stockholders of Coca-Cola and International, including petitioner, had signed the agreement with Equitable as agent, and had assembled blocks of both classes of stock for sale, one of the attorneys representing the interested stockholders and Equitable attended a directors’ meeting of Coca-Cola held in Wilmington, Delaware. This Avas on or about November 1,1935. The attorney took along with him the contracts authorizing Equitable to sell to Coca-Cola both stocks, namely Coca-Cola class A stock and International class A stock. The board of directors, acting for Coca-Cola, refused to buy any International class A stock. The attorney described the situation in his testimony as follows:
* * * AVell, I went ahead with the matter and drew up these contracts for them and took them up there, and we offered to sell to the Ooea-Cola Company, by contract of sale, so many shares of Coca-Cola and so many shares of International, and I did not have quite the number, and they would not accept the contract, they said they were going to buy nothing but Coca-Cola.
[[Image here]]
* * * It was our intention, as you see, to sell International to the Coca-Cola Company, and it was on this trip, about the first of November, when I was in Wilmington, that they told us definitely they would not buy International * * *.
*23 Following this refusal of Coca-Cola to buy International A stock, on November 2, 1935, Equitable and Coca-Cola entered into the agreement, incorporated in our findings of fact, relative to the 11,755 shares of Coca-Cola A in which nothing was said about International A, and in which it was provided that “Title to the shares to be sold and delivered hereunder shall not pass to the purchaser until the date the shares are delivered by the Escrow Agent to the purchaser.” On the same day, November 2,1935, Equitable entered into an agreement with the Trust Co. of Georgia which provided in part that:
Prior to December 6th, 1935 you [Trust Company of Georgia]' will cause the Class “A” International stock to be converted into Class “A” of The Coca-Cola Company, billing us for the expense, including the exchange fee. On December 6th, 1935 you will deliver the said shares to The Coca-Cola Company upon payment to you of the purchase price mentioned in the attached contract.
Thereafter, the Trust Co. of Georgia delivered the International A to International’s authorized transfer agent for retirement and in exchange for double the number of shares of Coca-Cola A which it then delivered to Coca-Cola as a part of the 71,755 shares mentioned in the agreement between that company and Equitable dated November 2, 1935. On December 9, 1935, it issued its check to petitioner, stating it to be in payment for 600 shares of International A at $105 less “Cost of exchanging stock for Coca-Cola stock 19$ per sh. $114.00.” Petitioner accepted the check. From these facts we think there can be no doubt that when the Trust Co. of Georgia delivered International A to International’s authorized transfer agent for retirement and in exchange for double the shares of Coca-Cola A, it definitely was not acting for the account of Coca-Cola, which had expressly refused to purchase any International A stock, but was acting for Equitable, which was petitioner’s agent. We hold, therefore, that the exchange is accountable to petitioner.
Petitioner contends that the contract of October 8, 1935, which he signed with Equitable was not broad enough to authorize Equitable to exchange the 600 shares International class A stock which he deposited for 1,200 shares Coca-Cola class A stock and then sell the 1,200 shares Coca-Cola class A stock to Coca-Cola for his account. We think differently-
Clause 7 of the contract of October 8,1935, which petitioner signed with Equitable, reads:
7. The Owner hereby ratifies and confirms all acts of the Agent and of said Advisers, and neither the Agent nor the Advisers shall be liable to the Owner for any act taken pursuant to the terms of this agreement except for a wilful tort or for an act done in the absence of good faith.
We think this clause of the contract is sufficient to give Equitable the authority to make the exchange and sale in question for petitioner’s account and that he is bound thereby. We so hold.
*24 The respondent determined the deficiency on the basis of two separate transactions, namely, (1) an exchange of the 600 shares of International A for 1,200 shares of Coca-Cola A, resulting in a gain of $66,576, and (2) a sale of the 1,200 shares of Coca-Cola A, resulting in a loss of $3,870. As a result of the stipulation that petitioner’s cost basis of the 600 shares is $13,017.97, the respondent concedes .that' the gain from the exchange is $53,558.03 and that the net gain from both transactions is that amount less $3,870 or $49,688.03, instead of the $62,706 determined in his deficiency notice.
Petitioner contends that, should the Board hold, as we have aboye, that petitioner must be regarded as having exchanged his International A for Coca-Cola A, then the transaction must be viewed as a whole; and that the separate steps in a single transaction can not be regarded as separate transactions. But in order to do this petitioner' argues that we must “disregard the transitory exchange of the International stock for Coca-Cola stock and regard the transaction in its true light, namely, that the Taxpayer sold his International stock for cash.” In support of this contention petitioner cites Prairie Oil & Gas Co. v. Motter, 66 Fed. (2d) 309; Tulsa Tribune Co. v. Commissioner, 58 Fed. (2d) 937; Muskegon Motor Specialties Co., 35 B. T. A. 851; Helvering v. Security Savings & Commercial Bank, 72 Fed. (2d) 874; Helvering v. General Utilities & Operating Co., 74 Fed. (2d) 972; Ahles Realty Corporation v. Commissioner, 71 Fed. (2d) 150; Bassick v. Commissioner, 85 Fed. (2d) 8; American Security & Trust Co. v. Tait, 5 Fed. Supp. 337; Helvering v. Bashford, 302 U. S. 454; and Carter Publications, Inc., 28 B. T. A. 160.
In the instant proceeding it will not, in our opinion, make any difference in the result of petitioner’s tax liability whether it be determined on the basis of a single transaction with several steps viewed as a whole, or whether it be determined on the basis of two separate transactions.
If petitioner’s tax liability be determined on the basis of two separate transactions, as the respondent has done, the gain on the first transaction, namely, on the exchange of 600 shares of International A for 1,200 shares of Coca-Cola A is the amount of $53,558.03. Since the 600 shares were retired, this transaction would be regarded as a distribution in partial liquidation of International under the decisions of W. R. Prescott, 31 B. T. A. 17; petition for review denied, 76 Fed. (2d) 3; rehearing denied, April 20, 1935, and Rose v. Trust Co. of Georgia, 77 Fed. (2d) 355, and under the principles enunciated in L. B. Ooley, supra, 100 percent of such gain would be taken into account in computing petitioner’s net income. The second transaction, namely, the sale of the 1,200 shares of Coca-Cola A to Coca-Cola for retirement would be on all fours with the transaction involved *25 in the Coley case, except that here petitioner would have a loss of $3,870 instead of a gain, and under section 117(a) and (d) of the Revenue Act of 1934, all of this loss would be allowed. The net result of the two transactions, therefore, would be a $49,688.03 gain, 100 percent of which would be taken into account in computing petitioner’s net income.
This method it seems to us is treating the transaction as a whole and the respondent has arrived at the correct tax consequences thereof. Of course if we could treat as petitioner’s only part of the transaction his delivery of the 600 shares of International class A stock to the Trust Co. of Georgia for sale to Coca-Cola, and that all steps thereafter were taken for Coca-Cola and not for petitioner Dodd, we would hold that petitioner had simply made a sale of his International A stock to Coca-Cola and would be accountable for the gain thereon at capital gain rates, and we would need to go no further. For reasons we have already stated, we can not treat the transactions, as carried out, in that maimer. Petitioner asks us to “disregard the transitory exchange of the International stock for Coca-Cola stock.” This we can not do. It is one of the material facts of the case. We know of no law or court or Board decision which would warrant us in disregarding it. We do not think that any of the cases cited by petitioner are any warrant for such treatment. We, therefore, approve the treatment which the Commissioner has accorded the transactions in his deficiency notice, except as to the basis of cost of petitioner’s International class A stock. The basis which the parties have agreed upon will be used in a recomputation of the deficiency.

Decision will be entered under Rule SO.